SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

PRINCETON ECONOMIC INTERNATIONAL LTD., Princeton Global Management Ltd. and Martin A. Armstrong, Defendants.

Commodities Futures Trading Commission, Plaintiff,

v.

Princeton Economic International Ltd., Princeton Global Management Ltd. and Martin A. Armstrong, Defendants.

No. 99 CIV. 9667, 99 CIV. 9669.

United States District Court, S.D. New York.

Feb. 2, 2000.

Carmen J. Lawrence, Dorothy Heyl, Securities and Exchange Commission, New York City, Andrew J. Geist, Eric M. Schmidt, David Rosenfeld, Helene T. Glotzer, New York City, for S.E.C.

Martin P. Unger, Blank Rome Tenzer Greenblatt LLP, New York City, for Martin Armstrong.

## OPINION AND ORDER

OWEN, District Judge.

On September 13, 1999, Judge Kaplan of this Court entered a Temporary Restraining Order upon application of the SEC and CFTC restraining defendants from further violating securities laws, freezing defendants' assets, appointing a Temporary Receiver to collect the assets and report, and granting other relief. As part of this TRO, the Receiver, attorney Alan M. Cohen, was authorized to "take and retain immediate possession, custody, and control of all assets and property" of corporate defendants Princeton Economics International Ltd. ("PEI") and Princeton Global Management Ltd., and "to manage, control, operate, and maintain their businesses." (TRO ¶¶ X.A, X.D). The Preliminary Injunction entered on October 28, 1999 ("PI Order") continued the receivership on terms identical to those of the TRO. (PI Order at 6–7). Both the TRO and the PI Order required Armstrong and his agents to provide the Receiver with "all assets of the corporate defendants which they have in their current possession, custody, or control." (TRO, ¶ XV.C; PI Order at 6–7).

At the inception of a now extensive investigation to locate and obtain such assets of the corporate defendants, and various related entities, the Receiver conducted a computer database search for real property owned by the defendants. This search identified a beach house located at 91D Long Beach Boulevard, in Loveladies, New Jersey, as a potential asset of the corporate defendants, the property being recorded by county tax authorities in the name of Princeton Economic Institute (the "Institute"). (Decl. of Tancred Schiavoni dated Jan. 5, 2000 ¶ 10).

From further investigation it appears:

1) The beach house and an adjoining lot were sold to Princeton Global Management Holdings, Inc. ("PGM Holdings") on October 8, 1993 for $1,565,379. (Id. ¶ 19, Exs. 4, 5).

2) The 1997 and 1998 tax returns of PGM Holdings identifies the beach house as its principal, if not its only, asset. (Id. ¶ 11, Ex. 6).

3) The 1997 property tax bill was issued to PGM Holdings. (Id. Ex. 3).

4) The 1998 and 1999 property tax bills were issued to the Institute. (Id. Exs. 1, 2).

5) From 1996 to 1999, all operational and maintenance expenses for the beach house were paid for from PGM Holding's account at Summit Bank. (Id. ¶¶ 24–25).

6) In May 1996, the PGM Holdings Summit Bank account received a credit from Caldwell Banker Real Estate Co. in the amount of $398,121.59, which represented the entire proceeds of the sale of the lot adjoining the house. In June 1996, $398,121.59 was transferred to the account of PEI at Republic New York Securities. (Id. ¶¶ 34, 35, Ex. 7).

In light of foregoing, the Receiver, contending that the beach house is an asset of the corporate defendants subject to the receivership, moved for an order (1) putting the beach house in his possession and control; (2) enjoining Armstrong or anyone else not acting under the direction of the Receiver from entering upon the property; (3) authorizing him to rent the house; and (3) authorizing him to explore the sale of the house. Armstrong opposes the motion by claiming that the beach house had been sold on September 7, 1998, and therefore it is not a corporate asset.

The Receiver has put before the Court documentation showing that the Institute

and PGM Holdings hold the deed and the tax title to the beach house. Armstrong does not dispute this. Thus, if these subsidiary entities are corporate assets, the beach house is a corporate asset and subject to the receivership. The first entity, the Institute, is dealt with easily. In a previous ruling on October 14, 1999, I concluded that the Institute is a corporate asset and subject to the receivership. The second entity, PGM Holdings, requires some tracing.

From the documentation presented, PGM Holdings (owner of the house) is wholly owned by two limited liability companies organized in the Turks and Caicos Islands, Princeton Global Management A Ltd. ("PGMA") and Princeton Global Management B Ltd. ("PGMB"). (*Id.* ¶ 47, Exs. 15, 16). The Articles of Association of both these companies authorize each to issue 2000 shares of stock. Stock certificates obtained from PEI's office in Princeton, New Jersey confirm that all these shares, 2000 shares of PGMA and 2000 shares of PGMB, were issued to PEI. (*Id.* ¶¶ 50–55, Exs. 18, 19). From this, it appears that the beach house is owned by PEI through the said subsidiaries, and as such it is an asset subject to the receivership.

Armstrong, however, contends that on September 7, 1998, in effect, PEI "swapped"[1] its ownership in the house by transferring ownership of PGMA and PGMB, among other assets, to a GNPK Family Trust (the "Trust"), an Australian entity with one Nigel Kirwan as trustee, in payment for the Trust's 50% interest in a public Australian fund known as Princeton Metals and Capital· Market Fund ("PMCM").[2] (Decl. of Martin P. Unger dated Jan. 12, 2000 ¶ 2). Under a contemporaneous side letter, the bill of sale for the house was amended to delay for a year the turnover as to the house with PEI continuing to maintain the house and pay all expenses—which were significant, running several thousands a month—at which point Kirwan was "free in [his] sole capacity to decide to rent the house or sell it at [his] discretion." (*Id.* Ex. B). This "year" was up September 7, 1999, five months ago (of which more later).

Annexed to the opposing declaration of Armstrong's attorney, Martin P. Unger, are photocopies of a document headed "BILL OF SALE" dated September 8, 1998, a letter to Kirwan from (and signed by) Armstrong on behalf of PEI to relating to this transaction,[3] a shareholders resolution for PEI approving this transaction, and, still only in photocopy, a "declaration" from Kirwan. (*Id.* Exs. A–D). Further in opposition, at oral argument, Armstrong's counsel handed the Court photocopies of three sheets of paper purporting to be stock certificates of PGMA and PGMB issued to the Trust and a stock transfer of PGMB stock from PEI to the Trust. (Tr. of Jan. 24, 2000 at 17). Significant is the fact that I (the Court) was never furnished the originals of any of these documents including the Kirwan declaration and Armstrong did not furnish an affidavit giving sponsorship as to any of them, so they are all sheer hearsay coming in on Armstrong's attorney's opposing declaration.

■ By reason of the above—and more hereafter—I do not give credit to any of the documents produced in opposition and treat them as nullities. They are all photostats and not competently sponsored by anyone with knowledge of their authenticity. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988). As

---

1. This word, "swapped," is Armstrong attorney Unger's word in his opposing papers.

2. PEI already owned the other 50% of PMCM.

3. It must be noted, however, that this letter does not mention the *Trust* as getting the house which the bill of sale does. It is addressed to Kirwan individually and reads, "Therefore, it is our agreement that *you* will accept the tangible assets of PEI, namely the reference collection of coins, one Black Basalt bust of Julius Caesar and the corporate beach house in Loveladies." (*Id.* Ex. B) (emphasis added). The inferences from this are many.

to the stock certificates and stock transfer, Kirwan's "declaration" recited that they were attached. They were not attached to the copy Unger annexed to his declaration, and I have never received the original of Kirwan's declaration, though two weeks have passed. Moreover, not only were the typed-on sheets of paper purporting to be the stock certificates, according to Unger given him by Armstrong a few days before the argument,[4] but they bear incorrect certificate numbers, being "1001" in each case, whereas the prior undisputedly valid certificates are each numbered "3 to 2000." I also observe that it is significant as to why, as of September 7, 1998, Armstrong would not have had the standard printed form of stock certificates issued to Kirwan by Princeton Global's transfer agent for this $2 million house. (*See* Schiavoni Decl. Exs. 18, 20). Viewing these circumstances in light of the fact that the current company records show that PEI owns PGMA and PGMB, and that the only formal stock certificates produced are those offered by the Receiver, which show that PEI owns the shares of PGMA and PGMB, I accept this showing of ownership.

I am reinforced in this view by the fact that even were Kirwan's "declaration" credited, and the supporting documents Exhibits A, B, and C to Unger's declaration credited, they are completely undercut by buyer Kirwan's conduct in the days before and the five months since September 7, 1999, the date upon which, according to the purported bill of sale, he was free to sell or rent the beach house, for Kirwan has never exhibited any interest at all in the house, either as owner or as trustee of the owner. Indeed, I explored this at length at oral argument, excerpted as follows:

THE COURT: [T]he question is . . . September 13 of '99, that Mr. Kirwan[5] has picked up the stroke with regard to paying any expenses? According to the position here, he owns the house, right? He owns the house, and, therefore . . . , assuming that it is credited that these documents give him the house since the beginning to September, one would expect that there were a lot of things, that he would try to rent it, he would try to sell it, he would try to use it, he would be writing people he has got a $2 million asset that I gather can be rented for some profit, and do you have any evidence whatever, any document, any letter Nigel to Martin: Martin, the year is up and I want to take over the house and I want to rent it; I want to sell it, or I want to do this, or I want to do that? Anything at all?

MR. KALARIA: Your Honor, I do not.

\* \* \* \* \* \*

THE COURT: You see, the [Receiver] is making a case based on documentation that this whole transaction [with GNPK Trust and Kirwan] is a sham. And these documents, they suggest to me, are a fabrication . . . .

\* \* \* \* \* \*

Let me ask you this: Do we have any documentation? Let me ask the front table: Did we have any documentation of—it's sort of public knowledge, isn't it, because the temporary receiver has been going in and out of that house looking at things and taking things out,

---

4. Indeed, when Mr. Kalaria, counsel for Armstrong, was asked at oral argument where the photocopies purporting to be copies stock certificates and stock transfer came from, typed on some blank paper with a barely discernible Princeton logo on top, Kalaria told the Court that his senior, Mr. Unger, told him that these copies had been given him by Armstrong a few days prior to the argument, and that they had not been produced to the Receiver because they were corporate records of the

*Trust,* not of PEI. Even accepting authenticity, that position is untenable. The copies were in the possession of Armstrong, and were corporate records of PEI, and therefore were within the turn-over order.

5. Mr. Kirwan's name is misspelled throughout the transcript as "Kerwon." I will use the correct spelling—Kirwan—when quoting from the transcript.

no question about that, right? Starting when?

\* \* \* \* \* \*

THE COURT: What I'm looking at is this: If this is Mr. Kirwan's house, he is saying to himself, "this guy Cohen and his minions are going in and out of that house of mine. What the heck are they doing there, okay?" And what I want to know is: when was that first entrance, so to speak, so that he is on notice that this is happening? And then I gather there isn't a scintilla of evidence that he makes one peep about anything going on in that house, not even to today, which is January 24?

\* \* \* \* \* \*

THE COURT: Well, in any event, [Kirwan] did not feel sufficiently moved to complain about this ravaging of his house, right?

MR. KALARIA: For whom to complain, Your Honor?

THE COURT: Mr. Kirwan or anybody else saying: what is this temporary receiver doing in my house? That's my house. I own it. I bought it. I have a letter. I have a bill of sale .... They started going in the house when?

MR. SCHIAVONI: November.

THE COURT: November. They have been going in since November....

\* \* \* \* \* \*

THE COURT: Since September of '99, there is no letter to anybody saying I own the house and you people are trespassers and you temporary receivers with all your high-priced lawyers going down there .... There are no complaints [to] the police department ... [p]eople are going in my house. I want a patrol over there to keep them out. Nothing like that. If he owned a two million dollar house, all of those

things would have happened. (*Id.* at 42–45, 47–49).[6]

To explain Kirwan's silence, when it was raised during the argument, Armstrong whispered to his lawyer, who then said to me that Armstrong had just told him that since he had an agreement with Kirwan to buy back certain *coins* up to December 31, 1999, (Unger Decl. Ex. B), Kirwan held off doing anything with the house. (Tr. of Jan. 24, 2000 at 44). I simply give no credence to this unsworn hearsay statement, Armstrong to Kalaria to me.

■ In summary, giving no weight or credence to the documents and evidence offered by the defendants to show that PEI has not owned PGMA and PGMB since September 7, 1998, and finding that PGM Holdings, which owns the beach house, is, in turn, owned by PGMA and PGMB, which are, in turn, owned by PEI, accordingly, the house is a Princeton defendant corporate asset subject to the receivership as set forth in the TRO and PI Order. It is further ordered that forthwith Armstrong and anyone else *not* acting under the direction of the Receiver are enjoined from entering the grounds of interior of the beach house. The Receiver is also authorized to rent the beach house, and to explore the possible sale of the beach house. Lastly, Armstrong or a designee is ordered to turn over within five days any and all keys or access devices to the beach house property in his possession to the Receiver.

So ordered.

---

6. [By the Court] Kirwan was certainly and timely aware of this conduct which he could view as in derogation of his ownership rights, yet he never availed himself of his clear ability to intervene in this action "to protect that interest." Fed.R.Civ.P.24.